Our first case is United States of America v. James Bailey-Snyder. Mr. Riech. Did I pronounce that correctly? Good morning, Your Honor. My name is Brandon Riech. Riech. I'm sorry. And I am here representing James Bailey-Snyder in this matter. I have two main issues that were included in the brief, but one has been... Could you reserve time for rebuttal? Oh, thank you for reminding me. I reserve three minutes for rebuttal. Very well. Thank you, Your Honor. There were two main issues in the brief. The first is involving well-settled law. That's actually the second and third in the brief. But that would be the application of Weatherly, and that was for prosecutorial vouching. Unless there's specific questions about the application of law to specific facts of this case, I would move to the speedy trial issue, which is the issue of first impression in this circuit. Mr. Bailey-Snyder, while awaiting the FBI's determination and the United States government's determination of whether to indict him, spent nearly 11 months in administrative detention. And it's that period that he's requesting the court consider for speedy trial rights timing. When do speedy trial rights attach? Speedy trial rights attach when one is accused. Accused. All right. In the nature of an arrest? In this case, we're asking the court to look to the factors in Marion. Marion, the broad language, included the word formal restraint. And I think the other circuits have looked at this issue and have decided against this position. Well, he's necessarily restrained in prison. All day long. So you really can't just use formal restraint. You have to use something that's a little bit more procedural, do you not? Well, in this matter, we're asking the court to allow us to go back and develop the factual record, Your Honor, so we can look at whether he had lost employment. Did he work in the laundry? Was he no longer able to do that? Did he subject himself to public obloquy as far as the prison goes? Well, let's go back to your first definition. Accused. He was really segregated so there could be an investigation. He really wasn't accused, was he? And I have to use that language because that's what the speedy trial right in the Constitution. All right. You have to, but tell me how he was accused at the point he was referred to SHU. The internal policies of the Bureau of Prisons can move somebody to administrative detention pending an investigation. And at that point, the FBI, whether they complete their investigation in six months, one year or five years, would be in charge of how long he's in administrative detention. The ability to demonstrate that in a record, I would like. I can't say that I have those facts before Your Honor. And I think the issue that's squarely before this court is whether, as a matter of law, as a legal conclusion, is somebody that's in administrative detention in the Bureau of Prisons able to claim speedy trial rights? The district court here, at appendix page 43, considered this a legal conclusion. And the opinion reflects that. And I think that's why I'm here arguing that we should have a factual determination, Your Honor, to explore some of the issues you were just asking questions about. Do the standards really fit the ones that you just mentioned before? Do they really fit for somebody who is incarcerated? Well, the public obloquy, he's not in public. So there are cases that say this is a very private, this maybe is a private matter. This is something between the jail and Mr. Bailey. But if you go back and look at some of the other language that talks about, in Barker, the concerns, or in Marion, the concerns of leaving somebody for a long time in pretrial detention, they talked about deplorable conditions for a length of period of time where somebody may be there. When someone's in administrative detention, Your Honor, he could be in a 23-hour lockdown pending trial. In this case, Mr. Bailey, I have to also concede, he took a year and a half to get to trial once he was indicted. So he was in 23-hour lockdown for two and a half years before he got to trial. Once I was appointed, I took him out of the trial within three months. So one of the considerations I'd ask the court to look at is also his ability to prepare for the case mentally. It's difficult for somebody to endure that. And maybe it's not the 36 years that we saw in Johnson versus Wetzel. Chief Judge O'Connor, or Judge Conner, rather, had determined there was an Eighth Amendment violation. But I think other than the Eighth Amendment, I can say very little about what are Mr. Bailey Snyder's rights in jail. He has the Eighth Amendment, and he may have a speedy trial. I'm asking the court to look at the speedy trial factors here. Does this mean that everyone who's placed into the special housing unit, the Speedy Trial Act clock begins to run for each person as soon as they're placed into the SHU? Everybody should be able to make that argument, yes. Some arguments will be very bad. There were some arguments that would fail because you're in for 10 days, you're in for 90 days. If somebody was in the SHU for five years, or maybe four and a half years, the statute of limitations may not have run, yet they've maintained this 23-hour lockdown within the statute of limitations because the FBI decided that they, or not decided. Sometimes the FBI is busy. And in this case, Agent Jones was in Alabama through the fall. And it took him some time, six months, to get to the jail where he was going to interview Mr. Bailey. But by the time trial came around two and a half years later, he had yet to interview any of the guards that were involved in the matter. But if it's a timing issue, that sounds like you're making a conditions of confinement argument, an Eighth Amendment argument. Getting back to Judge Rendell's initial question, I think the trigger here for the Speedy Trial Act is the arrest, right? And I guess the point of my question was, are you arguing that anytime someone's moved from general population to the SHU, that constitutes, quote, an arrest for purposes of the Speedy Trial Act? For purposes of the Sixth Amendment Speedy Trial claims, yes. And that is not the 70 days. That's the maybe it's one year, maybe it's more. And I think it is important to make that distinction, because otherwise I'm setting a very short clock. And the U.S. government doesn't know someone's been placed in the SHU. It's not fair. But if you look in this case, there's an email correspondence that was sent when he was placed in the SHU to the FBI. So there is fairly rapid notification. These are administrative facilities that should be able to work with sets of rules. And if the rules encourage them to move their cases forward, people like Mr. Bailey won't remain that long in a 23-hour lockdown that well exceeds the 90 days that he could have been placed there for a disciplinary segregation, because there's both administrative detention and there's disciplinary segregation. And these are set forth in the Code of Federal Regulations. And that's what that and the bureau policies are all that we have to look at, because we didn't have the facts here that gave this, could give this court a full chance to develop the record that even some of the other courts have looked at that are referred to within the body of the opinion here. So there's a block quote that addresses Waring, Daniels, Mills, Blevins, and Bamboulas. And in Waring, there was an evidentiary hearing held. Mills and the case relied on clarity. There's also evidentiary hearings held. But do those hearings, are they to determine whether there's been an arrest or an accusation? Or are they to determine once there has been an arrest or an accusation, then determine speedy trial? At one of the, and I don't recall the case, there was a, they would call somebody who was able to testify for the government that the government had, that the defendant was not placed in the SHU because of anything having to do with the government. That would be a factor the government could rely on. I could cross-examine that person, and I could suggest to them that was there any other reason other than the pending FBI investigation that he was placed in the SHU? Was he placed there for disciplinary reasons? Was he placed there for security? In other cases, Your Honor, there were detention orders that were entered of record. But that has to do with after there is an arrest, did the speedy trial rights attach, really? I just don't know how an evidentiary record is going to decide the issue of whether he was arrested or accused. If the issue of whether he's arrested or accused, again, it's a threshold issue. I need to establish arrest. If the court wishes to decide that somebody in administrative detention can never be arrested, can never be subject to the speedy trial rights, that may, and I think that's the invitation of the district court here. I believe this court's opinion in that case may create a split between the other circuits that had allowed for evidentiary hearings. Maybe it's how I read their evidentiary hearings, Your Honor. Maybe I'm looking at them incorrectly. I wasn't at those evidentiary hearings. But it appears to me that those evidentiary hearings were about the arrest. Do you want to touch on the vouching issue? The vouching issue, I would briefly ask the court to look at Weatherly. And in Weatherly, the defendant did not develop that there was some scheme occurring in whatever area this was that was going to allow or encourage officers to be crooked. There was, quote, wild speculation by the defense in that case. At the same time, the U.S. Attorney's Office did a good job of establishing that there was a discipline that could be imposed when considering promotions. In this case, through cross-examination of the correctional officers, I had asked about promotional incentives. Those promotional incentives I tied to the idea that they could have planted these to be promoted. It was an incentive. So why wouldn't this have been an invited response? The conjecture by counsel that, you know, do you really think this would happen? Why wouldn't that fall under an invited response? I believe because it was based on the record, unlike in Weatherly, where it looked like wild speculation. And the government, in this case, had no factual basis for the discipline to say somebody, as in Weatherly, would lose their job. Does this sound like common sense? It sounds like common sense. Somebody could lose their job if they lie under oath. But we ask that there are facts of record in a jury trial. Mr. Bailey Snyder is not entitled to a perfect jury trial, but we'd like to give him the best jury trial we can. So I was attempting to protect his rights as best we can with regard to evidence in a very difficult case, Your Honor. But again, I don't know if you've responded to why, as in Weatherly, reasonable response to allegations, your allegations, that they had an incentive. Why wouldn't it be a reasonable response to that? I believe it isn't reasonable because it would not be based on the record. In Weatherly, it was, Your Honor. In Weatherly, there was the development of the sanctions. And I apologize for not answering Your Honor's question. Maybe I'm not perceiving it right now. I may not have understood your answer. Am I correct there was no administrative hearing after the Schenck was found? Correct, as to the Schenck. There were 75 days of discipline imposed unrelated to this because Mr. Bailey Snyder had found himself in trouble for blocking a door and disobeying an order. So the hearings that were, that looks like, based on the pieces of paper the government gave me, the hearings, that's all the hearings were. So he was never brought before the DHO. And there are procedures that, again, I could try to develop a record somehow. I'm trying to find a starting point for the arrest or the accusation. The starting point, I think, has to be that when he was moved over to the SHU, and I'm stuck with that. It's not a great starting point, but that's a clear starting point. It would provide everybody with some clear guidance on the issue. And then an administrative facility would be encouraged to provide, it will create a discipline associated with that, put them in disciplinary segregation. I don't think that under this court's, under Newby, I believe the Bureau of Prisons can do that without risking a double jeopardy violation. There's no harm in doing that, and it would create some clear rules for people pending trial. Thank you. Thank you, counsel. We'll hear you on rebuttal. Mr. Hinckley? Good morning. May it please the court, Todd Hinckley on behalf of the United States of America. The decision that the court is faced with is to determine whether or not placing an inmate in a secure housing unit within the prison is, in effect, an arrest. We argue it's not. It's an administrative proceeding completely different and independent of the prosecution in this matter. There are a couple ways to look at that. I would argue that either in its cause or in its effect. In its effect, we're really talking about the Marion factors, which would be that an arrest is a public act that may seriously interfere with various things, such as a defendant's liberty. It would disrupt his employment, drain financial resources, curtail associations, subject to public alacrity, or have anxiety for a defendant's family. From the governor's point of view, just being in prison triggers all those things. So it doesn't seem to us that a change from his location in prison from one area to another would trigger any of those, to any degree that would require the court to find that as an arrest. Can prosecutors or law enforcement order placement into the SHU? I've never done so, and I'm not sure that we can. As far as you know, it's strictly a decision by the Bureau of Prisons? It's according to their own administrative rules. So as I understand it, what happens if an inmate is found, let's say, in possession of a shank, which is a violation of prison rules, he will be put into the SHU. An incident report will be prepared for administrative proceedings. Were there any in this case, any administrative proceedings relating to the shank? I believe there were, Your Honor. If you recall the testimony of Correction Officer Price on cross-examination of him, he spoke to what was the SHU. He indicated there was security within the prison. He indicated that after Mr. Bailey Snyder was found in possession of that shank, he was written up and he was placed in the SHU, and that SHU was anybody that is believed to have committed a violation of prison rules, that's where they go. So I'm assuming that once he got there, that process went forward. Of course, that's completely independent of the prosecution. Of course, there was that triggering event of he was written up and placed in the SHU. He was therefore accused, was he not? I'm sorry? He was therefore accused, was he not, of having had the shank? I mean, there had to be some reason he was put in the SHU. That's true. So once he's accused, wouldn't his rights be triggered? I would argue not because there's a parallel proceeding, the administrative proceeding, the violation of prison rules, that's why he ended up in the SHU. It's independent of whether or not the government even chooses later on to prosecute this defendant or any other inmate. Shouldn't there be a reasonable limit to bring this person to trial? Yeah, and I think if... Is there any limit at all? There is. There's the statute of limitations, which would be applicable to any person who's accused of a crime. Well, they would hope the statute of limitations would expire. They'd like to stay in for that long. That's not much of a limit. No. Well, I guess the question is whether that placement in the SHU is triggering anything in the prosecution, and it's not. It's an independent thing. He's placed in the SHU. Administrative proceedings go forward. The cases given to the FBI and the U.S. Attorney's offices decide whether it's a crime, whether we choose to prosecute or not. Those things happen separately. How about due process generally? Somebody's kept in the SHU for five years and nothing happens, and they say, oh, it's because, you know, we're investigating this shank. I mean, maybe it isn't a violation of due process. Well, I mean, he certainly has the opportunity to argue for administrative proceedings to remove himself from the SHU, because that's really what he's in there under the administrative procedures for the Bureau of Prisons. So he has that recourse. He can go that direction. But it's unlike a normal prosecution where, you know, maybe there's an investigation and someone doesn't like the fact that they're being investigated, but they're out free. There's no due process problem there. But when he's put into very adverse circumstances for a length of time. True. But, again, our position is he's in federal prison to begin with. He's just been removed from one area to another. It's a far cry, though. I mean, being in the SHU is much different from being in a regular population, is it not? I would concede that, yes. Not that I've been there. If there are no other questions on that, I move on to the vouching argument. And I think the court was correct in its questioning in regards to the vouching argument. In this case, the government's attorney was responding to the allegations made by the defense that there was some improper motive for the guards that they had more or less planted. He planted the seed that perhaps the guards had planted this shank in order to get some type of promotion or benefit. She was responding to that. She, again, she pointed out the facts and circumstances behind the search. She reminded the jury that the testimony from the correction officers, that one of them had found only two shanks during the past year. She went on to describe the testimony of the correction officers was as to the number of shanks and that finding one shank is not going to result in any type of benefit or promotion. Then I think she took the reasonable and common sense argument that someone is not going to risk their career for such a small potential for benefit. Is that in the nature of an assurance of someone who's been in this type of profession as compared to just conjecture? Because I think there's a distinction there. And if it's an assurance or the prosecutor is saying, listen, kind of trust me. No one's going to, you know, people in that position aren't going to do it. It gets close to the line, does it not? I disagree. I think if you ask anybody on the street, hey, if a correction officer were to plant a shank and lie about it in court, what would happen to them? I think most people would say, well, it's probably going to be the end of his career. I think that's just common sense drawn from the facts that were before, placed before the jury by the defense. But could that have been raised by the prosecutor alone, or was that valid comment only because of Mr. Bailey Snyder's counsel's argument that he wouldn't buy a home on the word of the two officers? That was part of it, but I think there's more. It goes back to the cross-examinations he was making during the trial in regards to what the promotional scheme is within the prison. And then he kind of reminded the jury during closing about that and saying, why did these correction officers take this person to a private area where no one else could see what was happening? And he was indicating that doesn't make sense, and then he added that particular statement. So it's a reply, I think, that was, again, we believe there's improper vouching and proper vouching. Proper vouching is when it's basically called for a response to something raised by the defense. And what was done here. Well, that's what I'm trying to get at. I'm trying to get at whether this was vouching at all. You know, sort of the prototypical vouching, I think, would be the prosecutor or the defense lawyer saying something like, I believe he's guilty and you should too. Right? That's sort of the obvious vouching. There are other types of vouching that aren't quite so obvious. Is this vouching that's permissible because it's a response to improper vouching by the defense counsel, or is this not vouching at all? This is some kind of something short of vouching like speculation or fair comment. Well, vouching constitutes an assurance by the prosecuting attorney of the credibility of a government witness through personal knowledge or by other information outside the testimony of the jury. That's kind of the legal standard. My position is it's like a commonly, it's common sense that if someone comes in and lies to the jury, plants a shank, the possibility someone's going to lose their career. So strictly speaking, I'm not sure it is vouching for that reason. If it is vouching, I think it's a reasonable response to what's been brought to the attention of the jury, some improper motive allegations that were lodged in this case. I hope I answered that question. You did. I want to go back to this administrative hearing. My understanding is after an incident report is filed, there has to be an administrative hearing within seven days and he can be present. Are you sure that that took place? I'm not sure that took place. And if it didn't take place, it has nothing whatsoever to do with the prosecution or not prosecution. Decisions are made separately. And Mr. Bailey Snyder has a route to take care of administrative issues. If there's a problem with the way that his administrative hearings were being held or not held, he can appeal through that process. And to conflate the two, I think, would be a problem. What would he, I mean, if he didn't get a hearing, what would, he would petition? He would ask for administrative review of the fact that... I believe there's administrative relief available to him. But your argument is that whatever happens in the administrative realm, that's a parallel track that is not germane to the question of whether the Speedy Trial Act clock begins to run. That is our position, yes. Let's talk for a minute about harmless error. This was a short trial and sort of depended upon the word of the two officers. If we were to find that the closing argument was improper vouching, how could that be harmless in light of the brevity of the trial and the paucity of witnesses? Because I think that there's, even though a short is overwhelming evidence of guilt, the inmate was found within the prison. They did a shakedown of him. They did a visual search of him. They found the shank in his shorts. But if the officers are not to be believed because they're trying to get a promotion and every time they find a shank, they get a notch in their belt, I mean, it's possible if the jury was swayed by that and said, you know, these officers, they planted it. Well, true, but on cross-examination, the correctional officers indicated that it's their overall performance that results in being able to be promoted. Everybody would say that. But the jury might have bought the idea that, you know, like the defense counsel brought out this fact. They might have said, hey, you know, I know what, this stuff happens. Stuff happens all the time. Evidence is planted. I suppose the jury could find that, but. I mean, it just goes to Judge Hardeman's question that tough to say categorically that didn't have an effect. Again, we don't think that there is anything wrong with that statement because it was called for by the defense's allegations that there is, you know, some type of misconduct. It occurs to me, does invited response, does that provide a kind of a free pass if it is an invited response? Or don't we still have to look at exactly what the invited response said? I think that's correct. I think it's not an open book. You can just go into any area you want. And here I think it was fairly narrowly argued that, and I think it's a good response to that that was raised, which is there's an allegation that there's misconduct by the guards for some type of promotional reason. So weighing that, jury were told, well, what are the downsides if caught doing just what the allegations say that they are? Well, and I guess if counsel had said, well, you know, I know these officers, and there's no way they're going to risk their career, et cetera, et cetera, that definitely, even though it might have been an invited response, it definitely would be wrong. I would be very uncomfortable arguing otherwise. Yeah, you should be. If you have no further questions, thank you for your time.  The rebuttal. May I begin rebuttal by asking this? You know, you have a tough mountain to climb when you've got the fourth, fifth, eighth, ninth and tenth circuits have all gone against you. It doesn't mean, you know, we're going to follow them. We're not bound, obviously. But what's wrong with their opinions in those cases? Where did they get it wrong? You know, it sort of comes when you've got that many circuits, it comes with sort of a mild presumption of correctness. But I'm eager to hear, you know, if you can point to what's wrong with those opinions, I'm eager to hear it. Thank you, Your Honor. If you look at maybe the dissent in one of the opinions where, and I believe it was wearing, one of the judges had asked for the preference for further factual development. I think that there really is a need for factual development with these issues. It's something that has to be looked at more closely. It can't be simply adopted. Some of the courts, not this court, but some of the other courts, I think, that have reached these conclusions have reached some pretty bare records. This court has none. Here's my trouble with that. It's a fair argument, but I think you told us initially that the clock starts running as soon as anyone is put in the shoe. And that's a categorical argument. As you said in response to Judge Schricker's question, it's administrable, it's clean, it has the virtue of clarity and predictability. But it's also categorical. And if it's categorical, then we would just have a factual hearing about whether the person was actually placed into the shoe or not placed in the shoe. Right. I suppose that's where the clock in my head would start for the analysis. That's the trigger for the analysis of what was the shoe like for that person. How did it deprive them of their employment, of their finances in the jail? How did it subject them to obloquy? Was there any other restraints on them that interfered with their rights? Or did it prejudice? Well, prejudice is difficult because that's part of the second test as well. But I didn't mean it to be a clear line for the entire test, but rather something I need to conceive. That has to at least occur. It's part of the analysis. Okay. So step one is when they're placed in the shoe, but then you're looking for factual development about the extent of the confinement in ADSEG and not only the length of time, but the secondary effects of that confinement. Correct. And I don't know that the other circuits have gone into all those details. So that might be also one distinction. And if findings were made on all those factors and they were negative, then you could keep somebody in the shoe for as long as you want, practically. Correct. Then it would be the statute of limitations. You could keep them in the shoe for maybe five years pending the FBI getting busy with some other things where people aren't just simply kept in a shoe for a long time. And the Bureau of Prisons has no policy to really protect anyone against that. At least I think 90 days after 90 days of disciplinary segregation, there would have been some rights either be transferred or have a regional review. So that's why in this case, although the record's not there, I don't believe that there was a disciplinary sanction imposed in this matter. And I feel pretty confident asserting that. I don't take that assertion lightly. I don't have the record for it, but that would be my basis for that. Thank you. Thank you, counsel. Court appreciates the argument.